Ronald Cantwell,                      :
            Petitioner          :
                         :
    v.                            :
                         :
Gunite Specialists, Inc. (Workers'    :
Compensation Appeal Board),           :    No. 925 C.D. 2022
            Respondent         :    Submitted: May 12, 2023

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge
             HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON            FILED: October 16, 2023

        Ronald Cantwell (Claimant) petitions for review from the July 29, 2022, order of the Workers' Compensation Appeal Board (Board). The Board affirmed the workers' compensation judge's (WCJ) December 30, 2021, order denying Claimant's claim petition on the basis that Claimant failed to establish he sustained a work-related injury while working for Gunite Specialists, Inc. (Employer). Upon review, we affirm.

## I. Factual & Procedural Background

        On September 12, 2019, Employer issued a medical-only Notice of Temporary Compensation Payable (NTCP). Reproduced Record (R.R.) at 207a. The NTCP stated that Claimant sustained a lower back strain or tear injury on August

15, 2019, while mounting a vehicle tire on a company truck.  R.R. at 207a-08a.  On November 5, 2019, Employer rescinded the NTCP when it issued a Notice Stopping Temporary Compensation (NSTC) and a Notice of Compensation Denial (NCD) asserting that Claimant had not actually sustained a work-related injury.[1]  *Id*. at 203a-06a.  On July 31, 2020, Claimant filed a claim petition asserting that he sustained a disabling work-related lower back injury on August 16, 2019,[2] while working for Employer.  R.R. at 1a-4a.  The petition stated that Claimant notified "Bob" of the injury on September 16, 2019,[3] and sought temporary partial disability benefits from September 16, 2019, through March 21, 2020, and temporary total disability benefits (based on weekly wages of $1,080) as of March 21, 2020, and ongoing.  *Id*. Employer denied liability in its answer to the claim petition, and this litigation ensued.  *Id*. at 9a-11a.

---

[1] Pursuant to Section 406.1(d)(1) of the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, added by the Act of February 8, 1972, P.L. 25, an NTCP may be issued by an employer that is "uncertain whether a claim is compensable under this act or is uncertain of the extent of its liability."  77 P.S. § 717.1(d)(1).  The NTCP provides the employer 90 days to investigate the claim, during which time its payment of medical costs, wage losses, or both will not result in an admission of liability.  77 P.S. § 717.1(d)(6).  If the employer elects to rescind the NTCP within the 90-day period, it must issue an NSTC within five days of the last payment of any form of benefits.  77 P.S. § 717.1(d)(5).  As Employer did here, issuing an NCD along with the NSTC is common practice.  *See Aldridge v. Workers' Comp. Appeal Bd. (Kmart Corp.)*, 113 A.3d 861, 863 (Pa. Cmwlth. 2015).

[2] Claimant clarified in his testimony that the injury occurred on August 15, 2019, as Employer's NTCP stated.  *Id*. at 68a & 87a.

[3] This date, roughly a month after the asserted date of injury, appears to have been in error as Employer issued its NTCP four days earlier on September 12, 2019.  *See* R.R. at 207a.  It is also unclear from the record who "Bob" is.

2

On October 28, 2020, Claimant testified remotely due to the COVID-19 pandemic.[4]  R.R. at 54a.  He was 35 years old at the time of his testimony and when the asserted injury occurred, he had worked for Employer for about 3 months as a diesel mechanic, performing various repairs to company trucks.  *Id*. at 63a.  The work required lifting up to 200 pounds (sometimes with assistance), standing, bending, and kneeling.  *Id*. at 63a-64a.  He acknowledged two prior workers' compensation claims: a knee injury in 2007-08 and a back injury in 2015.  *Id*. at 65a & 84a.  He was out of work for about six months due to the previous back injury and treated non-surgically at the Rothman Institute and at Novacare for physical therapy.  *Id*. at 66a & 85a.  He stated that after that injury, he did not treat for his back again until the August 2019 injury he asserts here.  *Id*. at 67a.  When he worked for Employer, it was full duty without restrictions.  *Id*.

Claimant testified that in mid-afternoon on August 15, 2019, he was lifting a tire to mount it on a company truck when he felt a strain and pop in his back.  R.R. at 69a & 91a.  There were no witnesses, but Claimant stated that his "direct manager" knew about it on that date.[5]  *Id*. at 87a.   Claimant recalled that he was in pain but able to finish his shift by avoiding bending and lifting.  *Id*. at 69a.  He stated that he put a heating pad on his back that night and rested.  *Id*. at 70a.  The next day, he had lower back pain and tingling and numbness in his left leg.  *Id*. at 71a.  He went to work and reported the injury to Employer's office; he did not receive any paperwork from Employer but believes an incident report was made.  *Id*. at 71a & 74a.  He was sent that day to Concentra, where he was given a muscle relaxer and

[4] Counsel for Employer stipulated that Employer received notice of Claimant's asserted work-related injury and that Claimant's asserted weekly wages were accurate.  R.R. at 62a.

[5] It is not clear from the record who Claimant's supervisor was on the date of the alleged injury.  Dan Baez (Baez), who testified in this matter, stated that he did not become Claimant's supervisor until after the alleged incident.  R.R. at 261a.

3

sent to physical therapy, but he went only twice to the therapy because he could not physically do it while also working. *Id*.

Claimant stated that Employer put him on light duty with restrictions on lifting until the COVID-19 pandemic hit in March 2020 and he was laid off due to shutdowns. *Id*. at 72a. Employer called about two weeks later and told him that he might be brought back at some later time if possible. *Id*. at 93a-94a. He acknowledged that there were days during the time between the asserted August 2019 incident and the March 2020 layoff when he called his supervisor Dan (Baez) and took days off or said he would be late due to his back pain. *Id*. at 94a. He denied taking unreported or unexcused time off during that period. *Id*. at 94a-95a. He also denied ordering parts without permission, for which he was written up, and refusing to sign disciplinary paperwork. *Id*. at 95a.

Claimant testified that he had not worked anywhere else since he was laid off by Employer in March 2020 and was receiving unemployment compensation since then. R.R. at 73a & 75a. He treated at Concentra until January or February of 2020, then self-treated with a heating pad and ibuprofen until July of 2020, when he began treating for his back at Healthbridge. *Id*. at 74a-75a & 88a. At the time of his testimony, he still had lower back pain and tingling and numbness in his left leg and sometimes also symptoms in his right hip. *Id*. at 79a. He was treating twice per week at Healthbridge and taking Gabapentin and a muscle relaxer. *Id*. at 77a-78a. He thought he could return to light duty work but did not feel able to resume full duty work due to the heavy lifting and bending. *Id*. at 77a. He had no other health insurance, did not drive often, and did regular household chores in the home he shares with his girlfriend and their two children, but no heavy lifting. *Id*. at 95a-96a.

4

Two fact witnesses testified for Employer in depositions on March 26, 2021. Allan Ewing (Ewing) has been Employer's owner and vice president since 2012. R.R. at 221a. He hired Claimant in June 2019 and stated that Claimant had no physical difficulty performing his work when he was hired. *Id*. at 222a & 232a. After the asserted injury, he approved light duty work on a full-time basis for Claimant and instructed Baez, the shop manager, to carry out the assignments. *Id*. at 223a. Ewing stated that on August 16, 2019, Claimant came into work but was "visibly not right." *Id*. at 224a. Ewing learned that Claimant had taken prescription pain medication that had been prescribed to someone else. *Id*. He wrote up a warning for Claimant showing up impaired, which Claimant refused to sign. *Id*. at 225a. Employer's policy is that three warnings will result in dismissal. *Id*. On September 30, 2019, Baez was on vacation and Claimant ordered parts and inventory without authorization to do so. *Id*. at 226a. Ewing wrote a second warning on that date, which Claimant again refused to sign. *Id*. at 227a.

Ewing stated that Claimant's attendance and timeliness became erratic in November 2019 and he called Claimant to the office in February 2020 to discuss attendance and performance. R.R. at 227a & 231a. He told Claimant that any further write-ups would result in termination, but Claimant continued to have attendance issues until March 21, 2020, when Ewing wrote him up a third time for unexcused absences and/or late arrivals and dismissed him. *Id*. at 228a-29a.

Baez also testified on March 26, 2021. He has worked for Employer since early 2019 and is the shop supervisor responsible for maintenance and repairs on Employer's trucks and equipment. R.R. at 248a. He worked with Claimant, then was promoted to supervisor in September 2019 after the asserted injury. *Id*. at 249a & 260a. He gave Claimant light duty work assignments. *Id*. at 250a. Claimant told

5

Baez at some point about previous back injuries and said that his back "had been hurting for a while." *Id*. at 250a-51a. When Claimant's attendance and timeliness declined between November 2019 and March 2020, he would call or text Baez. *Id*. at 251a-52a. Claimant's explanations to Baez varied, including stomach issues, car issues, and personal and family issues; the callouts were "not usually" due to back issues. *Id*. at 252a. Baez recalled that Claimant's attitude while on light duty was to do the "least possible" work and his work quality was not always good. *Id*. at 253a-54a. Baez reported his issues with Claimant's work performance and attitude to Ewing but was not involved in Claimant's disciplinary write-ups or termination in March 2020. *Id*. at 254a-55a.

Dr. Howard Sharf, M.D., testified for Claimant in a deposition on April 1, 2021. He is a board-certified orthopedic surgeon and spinal issues comprise about 50%-60% of his practice. R.R. at 110a-11a. Claimant first came to his office on January 5, 2021, and although Dr. Sharf did not see Claimant that day, his physician's assistant took Claimant's patient history and performed an examination. *Id*. at 112a. Claimant presented with back pain radiating down to his left leg (6 on a 10-point pain scale) and reported the asserted August 2019 incident consistently with his testimony. *Id*. at 114a-15a. The examination reflected tenderness at L4 in the lower lumbar region and the left sacroiliac joint with decreased sensation in an L3-4 dermatomal pattern on the left leg, which was indicative of radicular leg pain. *Id*. at 116a. Claimant was diagnosed at that visit with "lumbar back pain/strain, left-sided lower extremity radiculitis and possible sacroiliac joint inflammation." *Id*. A lumbar MRI was ordered, and anti-inflammation medication was prescribed. *Id*. Claimant underwent a lumbar MRI on January 11, 2021, which showed "left far

6

lateral intra-foraminal disc herniation at L4-5 and shallow bilateral intra-foraminal disc protrusion, left greater than right at L3-4." *Id*. at 118a-19a.

Dr. Sharf personally saw Claimant for the first time on March 9, 2021, about three weeks before the deposition. R.R. at 119a. Claimant presented with ongoing lower back pain and diminished sensation in his left leg. *Id*. Compared with his January 2021 visit, Claimant also had diminished left Achilles tendon reflexes and a positive straight leg raise test consistent with radiculopathy. *Id*. at 120a. Regarding Claimant's January 2021 MRI, Dr. Sharf stated that the herniation at L4-5 was compressing the nerve root, consistent with his exam, and there was bilateral disc bulging at L3-4; he diagnosed Claimant with lumbar radiculopathy due to the herniation, which Dr. Sharf opined was due to the asserted August 2019 work incident; he concluded that surgical decompression of the L4-5 disc would be needed. *Id*. at 121a-23a & 135a. A September 2020 EMG showed left L5 radiculopathy, which was also consistent with Claimant's March 2021 presentation. *Id*. at 131a.

Dr. Sharf stated that he reviewed records from the 2015 back injury Claimant described in his testimony and additional records from May and June in 2018 that Claimant did not mention in his testimony. R.R. at 132a. Dr. Sharf stated that knowledge of Claimant's prior back issues did not affect his opinion that the asserted August 2019 incident was the cause of Claimant's current condition because the most recent MRI showed "new" findings and Claimant's reports of his condition were "more intense, for lack of a better word." *Id*. at 133a. He noted that Claimant went from working without restrictions before the asserted August 2019 incident to being unable to work after it. *Id*. Moreover, even if the asserted August 2019

7

incident did not cause 100% of Claimant's issues, "they certainly caused enough of a change to merit surgical intervention." *Id.*

Dr. Sharf would not return Claimant to full duty work at that time and would release him only to light duty without lifting over 15 pounds, repetitive movements, bending, stopping, or squatting, and with rest breaks each hour. R.R. at 134a. With surgery, Claimant would hopefully be able to return to full duty work. *Id.* Because Dr. Sharf detected "new" findings on the post-August 2019 MRIs and his exam showed objective changes in Claimant's reflexes, he disagreed with Employer's doctor that Claimant sustained at most a soft tissue lumbar strain injury from the asserted incident. R.R. at 137a.

On cross-examination, Dr. Sharf agreed that Claimant had not been seen in his office or by him until about 18 months after the asserted August 2019 incident. R.R. at 140a-41a. He acknowledged that his only basis for finding Claimant's condition work related was his reliance on Claimant's report of the asserted incident and that he had not seen Claimant's full medical records until after the March 2021 visit. *Id.* at 147a-50a. Among the records was a January 2016 MRI that showed an acute disc bulge at L4-5 with superimposed left lateral disc herniation and displacement of the L4 nerve root. *Id.* at 151a-52a. Dr. Sharf conceded that the findings on the September 2019 MRI taken after the asserted incident were relatively unchanged from the 2016 MRI findings taken three years before the asserted incident. *Id.* at 153a. He also conceded that records showed Claimant presented at Upper Bucks Orthopedics in June 2018, about a year before the asserted August 2019 incident, with lower back and left leg pain. *Id.* at 157a. He admitted that his March 2021 clinical impression of diminished sensation at the left L3-4 dermatome was not confirmed by EMG results, which did show radiculopathy at L4. *Id.* at 165a-

8

66a. He maintained, however, that this additional information about Claimant's past back and left leg issues did not change his opinion that the asserted August 2019 incident caused Claimant's current condition. *Id*. at 163a-64a.

Dr. Robert Grob, D.O., testified for Employer in an April 29, 2021, deposition. He is a board-certified orthopedic surgeon and although spinal issues are 10%-15% of his clinical practice, he has not performed spinal surgery in 20 years and refers those cases to other physicians. R.R. at 271a & 298a. He saw Claimant for an independent medical examination (IME) on November 23, 2020. *Id*. at 272a. Claimant reported the asserted August 2019 incident consistently with his testimony. *Id*. at 273a. At the time of the IME, Claimant was treating with physical therapy and pain management. *Id*. at 274a. Claimant also reported the 2015 back injury consistently with his testimony. *Id*. at 275a. Claimant presented with lower back pain radiating down the left leg to the foot. *Id*. at 276a. He had no braces or assistive devices and did not walk with a limp. *Id*. On exam, Dr. Grob detected objective tenderness along Claimant's left sacroiliac joint. *Id*. at 277a. Claimant's straight leg raise test was negative and Dr. Grob detected no lumbar radiculopathy. *Id*. at 278a & 277a.

Dr. Grob reviewed the January 2016 MRI images and stated that they showed degenerative changes in the lumbar area that were "pronounced" at L4-5. R.R. at 280a. He also reviewed the September 2019 MRI images, which he read as showing further degenerative lumbar changes at L4-5 and L3-4. He did not detect any acute herniations, which would appear as "signal abnormalities" distinct from the rest of the images. *Id*. at 280a-81a. His records review included the 2015 lumbar injury Claimant testified about, but also two previous issues Claimant had not testified about: a lumbar injury in December 2009 and doctors' visits in 2018 for

9

left-sided lumbar pain. *Id*. at 282a-84a. Dr. Grob noted that the initial Concentra diagnosis after the asserted August 2019 work incident was of a lumbar strain with radiculopathy. *Id*. at 284a.

Dr. Grob concluded that based on his records review and examination, and assuming that Claimant's report of the asserted August 2019 incident was truthful, Claimant sustained "at most" a lumbar strain that had objectively resolved by the November 2020 IME. R.R. at 288a-89a. He would not recommend surgery, further treatment, or further work restrictions. *Id*. at 289a-90a. He stated that any lumbar herniations appearing on Claimant's 2021 MRI were documented in the 2016 MRI and therefore preceded the asserted August 2019 incident. *Id*. at 292a. Dr. Grob acknowledged during cross-examination that none of Claimant's prior back injuries resulted in a surgery recommendation, that Claimant had been working full duty at the time of the asserted August 2019 incident, and that he was the only doctor to find Claimant recovered. *Id*. at 297a-300a.

On December 30, 2021, the WCJ issued an opinion and order denying Claimant's claim petition. R.R. at 22a. The WCJ did not credit Claimant's testimony, noting that Claimant failed to testify to prior back issues and treatment in 2009 and between 2016 and the asserted August 2019 incident. *Id*. at 29a. The WCJ added that Claimant had not been honest about treating with a heating pad the evening after the asserted incident because Ewing's testimony established that Claimant had in fact taken prescription medication that was not his own and then had come into work the next morning impaired. *Id*. The WCJ credited Dr. Grob over Dr. Sharf because Dr. Sharf did not see Claimant until more than 18 months after the asserted incident and acknowledged the dependence of his opinions on Claimant's questionable veracity. *Id*. The WCJ also stated that even though Dr.

10

Grob assigned Claimant a strain injury, that diagnosis was also based on Claimant's unreliable reporting of the asserted incident. *Id*. The WCJ credited Ewing's and Baez's testimony as uncontested and supported by documentation of Claimant's attendance and disciplinary issues. *Id*.

The Board affirmed in a July 29, 2022, opinion and order confirming the WCJ's discretion to reject the testimony of Claimant and Dr. Sharf, which resulted in Claimant having presented no substantial competent evidence in support of his claim petition. R.R. at 46a-47a. The Board also concluded that the WCJ's decision was sufficiently well reasoned in light of its critique of Claimant's credibility and explanation of why Dr. Sharf's testimony was rejected. Claimant thereafter appealed to this Court. *Id*.

## II. Issues & Parties' Arguments

Claimant asserts that the WCJ's denial of the claim petition was not supported by substantial record evidence.[6] Claimant's Br. at 8. Claimant acknowledges that the WCJ has discretion to find any witness non-credible but argues that even without his testimony or that of his treating doctor, the record supported a work-related injury because Employer stipulated to notice and provided light duty work after the asserted incident and Dr. Grob, Employer's medical expert, diagnosed a lumbar strain. *Id*. at 10 & 13. Claimant asserts that at a minimum, he is eligible for wage loss benefits through the November 2020 IME when Dr. Grob

---

[6] On appeal, this Court's scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, and whether necessary findings of fact were supported by substantial evidence. *Morocho v. Workers' Comp. Appeal Bd. (Home Equity Renovations, Inc.)*, 167 A.3d 855, 858 n.4 (Pa. Cmwlth. 2017). On questions of law, our scope of review is plenary, and our standard of review is *de novo*. *Edwards v. Workers' Comp. Appeal Bd. (Epicure Home Care, Inc.)*, 134 A.3d 1156, 1161 (Pa. Cmwlth. 2016).

11

declared him fully recovered because Employer failed to establish that his termination was for reasons other than his work-related injury. *Id*. at 14.

Employer responds that Claimant seeks to overturn the WCJ's unfavorable credibility determinations, which were supported by the record. Employer's Br. at 18. Employer notes that Dr. Grob did not testify outright that Claimant sustained a lumbar strain from the asserted August 2019 incident; instead, he qualified his diagnosis as dependent on the veracity of Claimant's account of the unwitnessed asserted August 2019 incident. *Id*. at 19 & 26. Employer avers that the credible testimony of Ewing and Baez established that Claimant's termination was not due to a work-related injury, particularly given Claimant's extensive history of lower back issues and the lack of acute findings on his recent diagnostics compared with those taken prior to August 2019. *Id*. at 19, 21-23 & 26.

## III. Discussion

"Substantial evidence" is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *W. Penn Allegheny Health Sys., Inc. v. Workers' Comp. Appeal Bd. (Cochenour)*, 251 A.3d 467, 475 (Pa. Cmwlth. 2021). In performing a substantial evidence analysis, the evidence must be viewed in the light most favorable to the party that prevailed before the WCJ. *Id*. Where both parties present evidence, it is immaterial that there is evidence in the record supporting a factual finding contrary to that made by the WCJ; rather, the pertinent inquiry is whether there is any evidence which supports the WCJ's factual finding. *Id*. Mere speculation or conjecture is insufficient to support a factual finding, but where there exists the ability to draw reasonable and logical inferences from

evidence that is presented, including testimony, a conclusion so derived will be sufficient, even if it is not the only possible conclusion. *Id*.

> With regard to credibility, as this Court has often opined:
>
> [T]he primary role of the WCJ is well settled: The WCJ is the fact finder, and it is solely for the WCJ . . . to assess credibility and to resolve conflicts in the evidence. Neither the Board nor this Court may reweigh the evidence or the WCJ's credibility determinations.

*Cochenour*, 251 A.3d at 475. In addition, "it is solely for the WCJ, as the factfinder, to determine what weight to give to any evidence. . . . As such, the WCJ may reject the testimony of any witness in whole or in part, even if that testimony is uncontradicted." *Id*. "Determining the credibility of the witnesses is the quintessential function of the fact finder . . . . It is not an exact science, and the ultimate conclusion comprises far more than a tally sheet of its various components." *Id*. An appellate tribunal must view the WCJ's reasoning as a whole and may overturn a credibility determination only if it is arbitrary and capricious, fundamentally dependent on a misapprehension of material facts, or so otherwise flawed as to render it irrational. *Id*.

When a WCJ finds a claimant's testimony non-credible as to the occurrence of a work-related incident or injury, that determination will not be disturbed on appeal so long as it is supported by record evidence, is presented in a reasoned decision, and is neither arbitrary nor capricious. *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 75-76 (Pa. Cmwlth. 2012). In *Ausburn v. Workers' Compensation Appeal Board (Merrell & Garaguso)*, 698 A.2d 1356 (Pa. Cmwlth. 1997), the WCJ denied the claimant's claim petition after finding the claimant's testimony not credible and the claimant's treating doctor's testimony also not credible because it was based in part on the claimant's non-credible report.

13

*Id.* at 1357. The Board affirmed and this Court also affirmed, citing the standard of review, declining to reweigh the evidence, and finding that substantial evidence supported the WCJ's denial of the claim petition. *Id.* at 1358-59 & n.2; *see also Green v. Workers' Comp. Appeal Bd. (US Airways)*, 155 A.3d 140, 148 (Pa. Cmwlth. 2017) (stating that the WCJ may reject a doctor's opinion if it is based on information provided by the claimant that is either unsupported by record evidence or rejected as non-credible).

Here, Claimant testified consistently about the asserted incident and his symptoms. R.R. at 69a, 71a, 79a & 91a. However, he admitted there were no witnesses to the asserted incident and was unable to produce the supervisor to whom he reported the asserted incident that day. *Id.* at 87a. He stated that he treated only with a heating pad the evening after the asserted incident, but he received a written warning the next day for coming to work impaired after having taken someone else's prescription pain medication. *Id.* at 70a & 224a-225a. He stated that he had not treated for his back between 2016 and the asserted August 2019 incident, but medical records showed that he had in fact treated for back pain in 2018; he also omitted his 2009 back treatment from his history. *Id.* at 67a, 157a, & 282a-84a.

In addition to these inconsistencies, Claimant's credibility was further damaged by Employer's fact witnesses. Ewing and Baez testified that in November 2019, while Claimant was on light duty after the asserted incident, his attendance and timeliness became erratic. R.R. at 227a, 231a & 251a-52a. Claimant stated that these problems were due to pain from his injury. *Id.* at 94a. However, Ewing, whose testimony the WCJ found credible, stated that Claimant's absences were unexcused and ultimately led to his termination. *Id.* at 227a-31a. Baez, whose testimony the WCJ also found credible, stated that when Claimant called or texted him about his

absences, the explanations were usually of a personal nature or for physical issues other than his asserted back injury. *Id*. at 252a. Ewing produced documentation showing that Claimant received a written warning for coming to work impaired on August 16, 2019, the day after the asserted incident, due to having taken someone else's prescription pain medication. *Id*. at 238a. Claimant asserted that he reported the incident and injury from the day before, but Employer's documentation does not reflect that information. *Id*. at 238a-39a.

It does appear that Claimant reported the asserted incident at some point, because Employer stipulated to notice, placed Claimant on light duty, and issued an NTCP on September 12, 2019. R.R. at 62a, 207a-08a & 223a. However, Employer ultimately rescinded the NTCP on November 5, 2019, and has maintained since then that Claimant did not sustain a work-related injury at all. *Id*. at 204a. Given the foregoing, the WCJ was within his discretion to find Claimant's testimony not credible in any respect, and the WCJ sufficiently explained his reasons for doing so in the December 30, 2021, decision, highlighting Claimant's omission of his full history of back issues and his lack of truthfulness to Employer the day after the asserted incident, and the credibility of Ewing and Baez. *Id*. at 29a; *see Cochenour*, 251 A.3d at 475.

Similar issues undermined the testimony of Dr. Sharf, Claimant's treating doctor. He did not see Claimant personally until roughly 18 months after the asserted incident, did not review Claimant's full medical records until after that visit, and relied solely on Claimant's accounts for his opinions as to causation and extent of injury. R.R. at 140a-66a. Dr. Sharf also admitted that Claimant's 2019 MRI after the asserted incident was relatively unchanged from the 2016 MRI and that his clinical findings of radiculopathy at L3-4, which would have been "new"

15

since the previous injury, were not confirmed by EMG results. *Id.* As such, the WCJ was within his discretion to find Dr. Sharf's testimony less credible than that of Dr. Grob. Further, the WCJ sufficiently explained his reasons for his credibility determinations in the December 30, 2021, decision, which highlighted the length of time before Dr. Sharf saw Claimant, the lack of evidence or testimony concerning Claimant's treatment between August 2019 and March 2021, and Dr. Sharf's admitted dependence on Claimant's version of the asserted incident, which the WCJ had already found not credible. *Id.* at 29a; *see Cochenour*, 251 A.3d at 475; *Green*, 155 A.3d at 148; *Ausburn*, 698 A.2d at 1358-59 & n.2.

Further, Dr. Grob, Employer's medical expert, expressly qualified his diagnosis, stating that any injury from the asserted August 2019 incident was "at most" a lumbar strain and depended on the veracity of Claimant's account. R.R. at 288a. The WCJ, having already rejected Claimant's and Dr. Sharf's testimony as not credible, considered the qualified nature of Dr. Grob's testimony and explained: "We have found that history [provided by Claimant] to be unpersuasive[,] thus there is no support for Dr. Grob's opinion that there may have been a back strain." *Id.* at 29a. The WCJ was within his discretion to make this determination. *See Cochenour*, 251 A.3d at 475; *Green*, 155 A.3d at 148; *Ausburn*, 698 A.2d at 1358-59 & n.2.

Finally, Employer's September 2019 NTCP did not amount to substantial evidence of a disabling work-related injury because Employer rescinded the NTCP in November 2019 within the 90-day investigation period. R.R. at 203a-06a. It is possible that an incident occurred as Claimant described it and that he sustained back pain from it. However, Employer's rebuttal evidence, particularly Ewing's documentary evidence and the testimony of Ewing and Baez, undermined Claimant's assertions that he was disabled and that his alleged back injury was the

16

reason for his issues with work attendance and timeliness while on light duty, which led to his termination from employment. The WCJ's order denying Claimant's claim petition was therefore supported by substantial record evidence and the WCJ's opinion in support of the order was sufficiently reasoned. As such, the Board did not err in affirming the WCJ's order.

## IV. Conclusion

In light of the foregoing discussion, the Board's July 29, 2022, order affirming the WCJ's December 30, 2021, order, which denied Claimant's claim petition, is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ronald Cantwell,              :
          Petitioner     :
                      :
       v.            :
                      :
Gunite Specialists, Inc. (Workers'  :
Compensation Appeal Board),    :   No. 925 C.D. 2022
          Respondent   :

## O R D E R

AND NOW, this 16th day of October, 2023, the July 29, 2022, order of the Workers' Compensation Appeal Board is **AFFIRMED**.

_____
CHRISTINE FIZZANO CANNON, Judge